**IN THE COURT OF APPEALS OF IOWA**

No. 24-1734
Filed January 23, 2025

**IN THE INTEREST OF K.B.,**
**Minor Child,**

**D.E., Mother,**
    Appellant,

**M.B., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

The mother and father separately appeal the termination of their respective parental rights. **AFFIRMED ON BOTH APPEALS.**

Robert W. Davison, Cedar Rapids, for appellant mother.

Kristin L. Denniger, Mount Vernon, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Michael Lindeman, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered by Greer, P.J., and Buller and Langholz, JJ.

**GREER, Presiding Judge.**

The mother and father of K.B., born in 2021, separately appeal the termination of their parental rights. Both parents challenge the statutory grounds and argue termination of their respective parental rights is not in K.B.'s best interests because of the closeness of each parent's relationship with the child.

Our review is de novo. *In re A.H.*, 950 N.W.2d 27, 33 (Iowa Ct. App. 2020). It is confined to those issues that—after being properly preserved—are actually raised and briefed on appeal by the parent challenging termination. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996). Because "each parent's parental rights are separate adjudications, both factually and legally," we consider each parent's appeal separately. *In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020) (citation omitted).

**I. Mother's Appeal.**

The juvenile court terminated the mother's parental rights to K.B. pursuant to Iowa Code section 232.116(1)(g) and (h) (2024). The mother challenges the statutory grounds and argues the loss of her rights is not in the child's best interests because of the closeness of the parent-child relationship.

Before we can consider the merits of the mother's claims challenging termination, we must first determine whether the mother failed to preserve error on or waived her claims. As the State points out, the mother did not personally attend the termination hearing, and her attorney did not convey even a general resistance on the mother's behalf.[1] Additionally, the mother's attorney presented no evidence

---

[1] The hearing was a combined child-in-need-of-assistance (CINA) review and a termination hearing. At the beginning, the court said, "We will handle the review first and then proceed to the termination matter," before asking each attorney for their position as to the review hearing. When the court got to the mother's attorney,

and did not cross-examine the one witness who was called (the case manager from the Iowa Department of Health and Human Services).

We recently recognized that there was "'some tension in our cases' regarding what a parent must do to protect their right to appeal a termination of parental rights." *In re J.R.*, No. 24-0942, 2025 WL 52738, at *1 (Iowa Ct. App. Jan. 9, 2025) (en banc) (citation omitted). So, we clarified that "there is no categorical rule that a parent must personally participate in a termination hearing to preserve error or prevent a waiver on appeal" and recognized that "[w]hile issues generally must be raised in and decided by the juvenile court before they are raised on appeal, that is not the case when a parent argues the State failed to meet its burden of proof." *Id.* at *1, *2. That said, in *J.R.,* we noted the attorney for the absent mother "relayed the mother's general resistance to termination and her preference for a guardianship" and "also cross-examined the social worker from the Iowa Department of Health and Human Services." *Id.* at *1. We explicitly "[did] not reach the issue of whether the mere appearance of a parent's attorney is enough to clear the preservation and waiver hurdles because that [was] not the situation in the case before us." *Id.* at *1 n.1. That issue is now squarely before us in this case.

---

he stated, "Your Honor, during my brief representation of my client, I've had one very brief phone call, so I would offer no position today." After hearing from the rest of the attorneys, the court stated, "Thank you. Today, prior orders will continue pending the outcome of the termination trial, and we will proceed to that matter."

The State attributes the attorney's comment that he "offer[ed] no position" to the mother's stance on whether the termination petition should be granted. We do not agree with that characterization; we understand the comment to be limited to the review proceedings. Still, the mother's attorney was not asked to make a statement or take a stance on behalf of the mother once the termination proceedings began, and the attorney did not volunteer one.

Here, although the mother did not make even a general resistance to termination, we conclude she did not waive or fail to preserve at least some of her claims on appeal. The mother did not consent to termination, *cf.* Iowa Code § 232.116(1)(a), and the juvenile court's ruling shows it understood that the termination petition was resisted by the mother—it considered whether the State introduced sufficient evidence to grant the termination petition on the statutory grounds alleged. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (recognizing the State has the burden to prove a statutory ground for termination). While neither the mother nor her attorney did anything to test the quantum or quality of the State's evidence, even in the face of the mother's silence, the State retained the evidentiary burden to put forth sufficient evidence to establish a ground for termination and that termination of the parents' rights was in the child's best interests. *See In re A.R.*, 316 N.W.2d 887, 888 (Iowa 1982) (considering whether the State proved the elements of the statutory ground for termination even though the mother failed to raise the issue in the juvenile court); *see also In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021) ("The State must prove termination was proper by clear and convincing evidence.").

Like this court concluded in *J.R.*, we decide the mother may challenge the first two steps of the termination analysis—whether a statutory ground was proved and if termination of her rights is in the child's best interests—despite her lack of action at the termination hearing. *See* 2025 WL 52738, at *2; *see also* Iowa R. Civ. P. 1.904(1) ("The court trying an issue of fact without a jury . . . shall find the facts in writing, separately stating its conclusions of law, and direct an appropriate judgment. A party, on appeal, may challenge the sufficiency of the evidence to

sustain any finding without having objected to it by motion or otherwise."); *A.R.*, 316 N.W.2d at 888 (holding now-rule 1.904(1) applies to juvenile proceedings).

So, we proceed to the mother's argument the State failed to establish a statutory ground for termination. The juvenile court determined there was clear and convincing evidence to terminate the mother's parental rights under paragraphs (g) and (h) of Iowa Code section 232.116(1). When the juvenile court terminates parental rights on more than one ground, we may affirm on any ground we find supported by the record. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We choose to review termination under section 232.116(1)(h), which allows the juvenile court to terminate when it finds all the following:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The mother challenges only the fourth element—whether K.B. could be returned to her at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4); *see also In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (applying element four to mean "at the time of the termination hearing").

The family came to the attention of the Iowa Department of Health and Human Services this time[2] in December 2022 based on allegations the father was using cocaine and methamphetamine and acting as a caretaker for K.B. Both

---

[2] The mother's parental rights were terminated to another child in January 2020.

parents agreed to complete drug testing; the mother's hair tested positive for methamphetamine, while the father tested positive for methamphetamine and amphetamine. One-year-old K.B. was also tested; the results came back positive for exposure to and ingestion of methamphetamine. Additionally, the mother admitted to the department that there was a history of domestic violence in her relationship with the father and that he had pending domestic-violence charges based on recent incidents. K.B. was removed from parental custody.

The mother began attending inpatient substance-use treatment immediately; the program lasted for about two months. And then, from February 2023 to September, she continued to participate in outpatient treatment and generally completed drug testing as requested with results that showed no illegal drug use. Based on the mother's demonstrated sobriety, her ability to parent K.B. well during her visits with him, and her reports she was no longer in a romantic relationship with the father, she was moved up to unsupervised and then overnight visits with K.B. Then, with juvenile court authorization, a trial home placement began on September 14.

Less than two weeks later, the juvenile court rescinded the authorization for the trial home placement and ordered the mother to revert to fully supervised visitation with K.B. Just a few days after the trial placement began, the father—who was only allowed supervised visitation, which the mother was not authorized to provide—visited the mother's home. The mother knew the father was coming over and allowed him to do so. While he was there, the mother and father had a verbal spat that culminated in the father strangling the mother for several seconds; K.B. was in the home at the time.

The mother moved to reinstate the trial home placement. And the department urged the court to grant it, arguing that the mother was not responsible for the father's violent behavior and that she showed protective capacity with her actions after the incident. The county attorney resisted, alleging that the version of events the mother reported to the juvenile court was not the same she told police officers on the night of the incident (based on the bodycam footage from officers), interactions between the mother and father on social media (both before and after the September 18 assault) suggested they were maintaining a romantic relationship in spite of their claims to the contrary, and the fact that the father had belongings in the mother's apartment—where she had only been living for about a month—suggested the father was around during the mother's other unsupervised times with K.B.

After a hearing on the issue, the juvenile court denied the mother's request, ruling:

> After hearing all the evidence, the Court finds that the trial home placement shall not be reinstated. The Court did not find the mother to be credible in any way. The Court firmly believes that the parents relationship has continued throughout this case, they just have not been honest with the team about it. [The mother] further has absolutely no insight as to the danger he presents to her and to [K.B.]. The mother's assertion that their relationship was over after the assault is not credible either. She was still exchanging responses and reactions with him on Facebook AFTER the assault. Those coincidentally ended on the same day that the trial home placement ended. The mother invited the father over to get his laundry knowing that he was not to be unsupervised with [K.B.]. It is likely she has been allowing the father access to the child at other times as well.

Although the mother had several months of sobriety from methamphetamine at the time the trial home placement was ended, after that, the mother began regularly using methamphetamine again. She tested positive for methamphetamine four

tests in a row—on October 23 and 30 and November 2 and 9. After that, the mother had a string of tests that showed no illegal drug use before failing to attend two drug tests in late January 2024, testing positive for methamphetamine and amphetamine four times in February, and failing to attend all six tests in March. As already noted, the mother did not attend the termination hearing, which took place on April 8.

The mother asserts K.B. could be returned to her as of the April 8 hearing. She suggests that because she was allowed to have unsupervised parenting time with K.B. up until the father's perpetration of violence in September 2023 that it is really the father who is the danger to K.B.'s safety. And, because the father was incarcerated at the time of the termination hearing, the mother argues K.B. could be safely returned to her. While the father's violent actions are a real, valid concern, they are not the only issue relating to K.B.'s safety. As to those safety concerns, the mother repeatedly tested positive for methamphetamine in the months leading up to the termination hearing; rather than addressing this issue, the mother denied using the drug and did not complete substance-use treatment following her relapse. Her unresolved issues with methamphetamine are enough to prevent the return of K.B. to her. *See, e.g.*, *In re J.H.*, No. 22-1290, 2022 WL 16985230, at *3 (Iowa Ct. App. Nov. 17, 2022) (concluding a parent "regularly test[ing] positive for methamphetamine as late as the weeks leading up to the termination hearing . . . itself would prevent the children from being returned"); *In re P.D.*, No. 19-1824, 2019 WL 6894420, at *1 (Iowa Ct. App. Dec. 18, 2019) ("Given the mother's continued use of methamphetamine, the child would be at risk of adjudicatory harm."). We agree with the mother's statement that the father's

perpetration of violence is not her fault. But her choices to allow the father around K.B. without department supervision—in violation of court orders—and to maintain a romantic relationship with a man who, in her own estimation, has strangled her about ten different times are her responsibility. Following our review, we conclude the State proved that K.B. could not be safely returned to the mother at the time of the termination hearing, establishing section 232.116(1)(h) as a ground for termination. *See, e.g.*, *In re G.C.*, No. 03-1096, 2003 WL 21919900, at *1 (Iowa Ct. App. Aug. 13, 2003) (affirming termination of parents' rights when the parents' relationship was "unstable and riddled with domestic violence"; the parents were "incapable of protecting [the child] from their volatile relationship," which prevented the child's return to the home).

Next, the mother argues termination of her parental rights is not in K.B.'s best interests, focusing on the close relationship she shares with the child.[3] *See* Iowa Code § 232.116(2). At the time of the termination hearing, K.B. was about thirty months old—he had spent nearly sixteen of those months outside of his mother's custody. While the mother had a good relationship with K.B. and was able to highlight her parenting skills during supervised visits, her continued use of methamphetamine prevented her from being K.B.'s safe full-time caregiver. As the mother was not yet addressing her relapse on methamphetamine at the time

---

[3] Insofar as the mother meant to invoke the permissive exception in section 232.116(3)(c), we do not consider it. The parent resisting termination bears the burden to establish the application of exception is warranted. *See A.S.*, 906 N.W.2d at 476. Because she bore the burden, the mother's "passive approach" at the termination hearing "has consequences" under section 232.116(3); because neither she nor her counsel addressed the statutory exceptions or offered any evidence to support them, the mother waived this issue. *J.R.*, 2025 WL 52738, at *2.

of the termination hearing, it is not clear when—or even if—she would be able to be that caretaker in the future. K.B. deserves a safe, stable home now; termination of the mother's parental rights and adoption will allow him to have that. *See A.B.*, 815 N.W.2d at 777 ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) . . . ." (citation omitted)).

We affirm the termination of the mother's parental rights to K.B.

## II. Father's Appeal.

The juvenile court terminated the father's parental rights to K.B. pursuant to Iowa Code section 232.116(1)(e) and (h). He challenges the statutory grounds and argues the loss of his rights is not in the child's best interests because of the closeness of the parent-child relationship.

As with the mother, we can affirm termination of the father's parental rights on any ground supported by the record and we choose to review under section 232.116(1)(h). And, like the mother, the father challenges only the fourth element—whether K.B. could be returned at the time of the April 2024 termination hearing. The father admits he was incarcerated at the time of the hearing; he argues that while K.B. could not be returned to his physical care, the child could have been returned to his legal custody and the father's "extensive network of relatives [could] care for K.B. until his release."[4] While we appreciate the distinction the father is making, the father has provided no legal authority showing

---

[4] Within this section, the father also argues K.B. could have been returned to the mother. Because the father "[does] not have standing to assert" arguments on behalf of the mother, we do not consider this argument. *In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007).

a child-welfare proceeding where an Iowa court returned the child to the parent's custody while the parent remained incarcerated. *Cf. In re T.W.*, No. 20-0145, 2020 WL 1881115, at *1 (Iowa Ct. App. Apr. 15, 2021) (reviewing multiple cases where the supreme court considered whether the child could be safely returned to the parent's care at the time of the termination hearing when reviewing statutory ground). And the father, who was in and out of jail throughout the child-welfare proceedings, also has an unresolved history of methamphetamine use and perpetrating domestic violence. We cannot say K.B. could be safely returned to the father's care even if he was not incarcerated—upon his release from jail, the father would need to take further actions to become a safe parent for K.B. The State proved the ground for termination under section 232.116(1)(h). *See id.*

Next, the father argues termination of his rights is not in K.B.'s best interests, *see* Iowa Code § 232.116(2), and suggests his rights should be saved because of the closeness of the parent-child relationship, *see id.* § 232.116(3)(c). As we have often repeated, "[a] child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests." *In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially). At the time of the termination hearing, the father was not able to provide K.B. either of the two. And while he mentions the closeness of his relationship with K.B., it is the father's burden to establish the hardships of termination would outweigh the benefit K.B. will receive through termination of the father's rights and adoption. *See A.S.*, 906 N.W.2d at 476 (recognizing parent has the burden to establish the permissive exception); *D.W.*, 791 N.W.2d at 710 (when determining whether to apply section 232.116(3)(c) to save the parent-child relationship, "our consideration must center

on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs").  The father has not done so.

We affirm the termination of the father's parental rights to K.B.

**AFFIRMED ON BOTH APPEALS.**

Langholz, J., concurs; Buller, J., partially dissents.

**BULLER, Judge** (concurring in part and dissenting in part).

I concur in the judgment but dissent from the majority opinion's approach to error-preservation, which answers a question left open by and goes farther than the recent decision in *In re J.R.*, No. 24-0942, 2025 WL 52738, at *1–2 (Iowa Ct. App. Jan. 9, 2025) (en banc). Here, despite accepting personal service of the termination petition, the mother below did not make even a token resistance to termination, through counsel or otherwise:

- She failed to appear for trial despite calls throughout the courthouse;

- Her attorney did not offer any exhibits or cross-examine any witnesses;

- And, neither orally nor in writing, did the mother or her attorney ever argue against or contest termination.

As the majority correctly explains in footnote one, the mother's attorney told the juvenile court he could offer "no position" on the issues because he was not given direction from his client during the one "very brief phone call" they had. Indisputably, the first time the mother contested termination at all was in her appellate filings.[5] Yet the majority concludes error was preserved, going beyond *J.R.*, 2025 WL 52738, at *1. I disagree with any expansion of *J.R.*'s holding.

Many of the criticisms in my *J.R.* dissent are present in this case, too: the majority is unnecessarily deciding an unpreserved error and considering specific

---

[5] As a side note, the mother's petition on appeal never cites to the record in its recitation of facts, contrary to the rules of appellate procedure. *See* Iowa Rs. App. P. 6.201(1)(d), .1401–Form 5; *In re K.D.*, No. 21-0581, 2021 WL 3897419, at *2 (Iowa Ct. App. Sept. 1, 2021) (discussing these rules). Despite our rules requiring record citations, the petition makes personal assertions about the mother's mental state or emotions, attempting to explain her absence from trial. These statements are not evidenced in the record, clearly violate the rules, and highlight why a parent should not be allowed to voluntarily absent him- or herself from trial only for their lawyer to gin up new arguments for the first time on appeal.

legal arguments the district court never had a chance to evaluate and the State never had the opportunity to argue against. *Id.* at *3 (Buller, J., dissenting in part). I remain convinced deciding such claims on appeal runs counter to our statutory role as a "court for the correction of errors at law." Iowa Code § 602.5103(1) (2024). And, as a policy matter, there is merit to the approach taken by other states that find a willful failure to attend a termination trial waives appeal. *Id.* at *4 n.5.

But the issue here goes beyond the majority's holding in *J.R.*, now undermining our case law on waiver or forfeiture in addition to error preservation. *See generally* Tory A. Weigand, *Raise or Lose: Appellate Discretion and Principled Decision-Making*, 17 Suffolk J. Trial & App. Advoc. 179, 182–87 (2012) (on distinctions between waiver and forfeiture across various jurisdictions). And the majority opinion's treatment of this record creates perverse incentives for parents in future juvenile cases to skip out on trial and gamble on appellate lawyers spotting issues that were not fully or adequately litigated below. This defies core tenets of appellate review. *See DeVoss v. State*, 648 N.W.2d 56, 60 (Iowa 2002) ("[I]t is unfair to allow a party to choose to remain silent in the trial court in the face of error, taking a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable." (citation omitted)). It's bad public policy. And it certainly does not benefit the children at the heart of these cases to allow parents who didn't bother to attend trial or resist termination an opportunity to unwind completed terminations after a trial they willfully avoided.

Bottom line: My view is that we should enforce our error-preservation rules rather than allow exceptions to swallow them.